JAMES TALCOTT, INC., Plaintiff-Appellee,

v.

ALLAHABAD BANK, LTD., Bank of Baroda, Ltd., Bank of Tokyo, Defendants-Appellees.

CITY TRADE & INDUSTRIES, LTD., Defendant-Third-Party Plaintiff-Appellant,

v.

NEW CENTRAL JUTE MILLS COMPANY, Ltd., Third-Party Defendant-Appellee.

No. 29464.

United States Court of Appeals, Fifth Circuit.

May 5, 1971.

Rehearing Denied and Rehearing En Banc Denied June 10, 1971.

W. Ward Newton, Lyons, Ga., Marshal C. Berger, New York City, Sharpe, Sharpe, Hartley & Newton, Lyons, Ga., for defendant-third party plaintiff-appellant.

Joseph M. Oliver, Thomas S. Gray, Savannah, Ga., Francis J. Ryan, Hahn, Hessen, Margolis & Ryan, New York City, Oliver, Maner & Gray, Savannah, Ga., for plaintiff-appellee.

George W. Williams, Bouhan,Williams & Levy, Robert M. Williams, Savannah Ga., Kenneth Carroad, Edward B. Connolly, New York City, for third party defendant-appellee.

Kennedy & Sognier, Adams, Adams & Brennan, Edward T. Brennan, Savannah, Ga., for Intervenor.

Malcolm Maclean, Mark M. Silvers, Jr., Connerat, Dunn, Hunter, Houlihan, Maclean & Exley, Savannah, Ga., for defendants-appellees.

Before THORNBERRY, GOLDBERG and AINSWORTH, Circuit Judges.

THORNBERRY, Circuit Judge:

In this multiparty, multi-issue, multi-suit litigation,[1] CTI appeals from adverse judgments below [2] awarding the contested fund in interpleader to the Indian Banks, quashing service of process against the New Central Jute Mills, and dismissing its counterclaim against James Talcott, Inc. On account of the complex nature of the proceedings, we

---

1. All told, six suits have been filed in connection with this controversy.

2. James Talcott, Inc. v. Allahabad Bank, Ltd., S.D.Ga.1969, 310 F.Supp. 6.

shall take up CTI's claims against each of the three appellees separately. First, however, because a full understanding of this controversy and the results we reach is impossible without knowledge of what has transpired to date, we present the factual and procedural history of this litigation.

## I.

## FACTS AND PROCEDURAL HISTORY

### A. RELATIONSHIP OF THE PARTIES

City Trade & Industries, Ltd., a New York corporation [CTI], the appellant herein and a defendant-third party plaintiff below, entered an agreement in 1959 with New Central Jute Mills, a concern in India, which produces jute backing for rugs and carpets. By the terms of the agreement, CTI was appointed New Central's exclusive distributor for the sale of jute backing in the United States for a period extending to March 31, 1964. CTI alleges that under this agreement financing between itself and New Central was arranged especially for New Central's convenience to enable New Central to comply with the laws of India.

According to CTI, the laws of India prohibited New Central from exporting jute to the United States unless there existed in the United States a purchaser who had paid or promised to pay for the goods in United States dollars. Further, CTI claims that New Central was required by the laws of India

to engage in the export of jute only with the permission [of] the Reserve Bank of India [which, incidentally, CTI identifies with the Banks in the instant action, since, according to CTI, the Banks herein are members of the Reserve Bank].

CTI then charges that

[s]uch permission was obtained from the Reserve Bank by New Central with respect to each and every shipment of jute by New Central to CTI during the years 1959 through 1964. The permission thus granted by the Reserve Bank to New Central required that New Central's shipments of jute would be paid for by CTI within 180 days in United States dollars, and in representing the transactions to the Reserve Bank, New Central formerly [sic] characterized CTI as a purchaser of New Central's jute. In point of fact, however, the Reserve Bank has full knowledge of the relationship between New Central and CTI as that of principal and exclusive distributor and selling agent for New Central * *.

Consequently, CTI alleges, it made payments for jute exported to the United States to meet sales commitments it had made in New Central's behalf, as if it, CTI, were the purchaser. For the purpose of making these payments, CTI established irrevocable letters of credit in favor of New Central for ninety-five percent of the cost of freight port of distribution price. For the remaining 5% of the cost and freight price, New Central drew sight drafts upon CTI payable within 90 days. As a general rule, the source of payment of the drafts at maturity was the proceeds of the sale of jute by CTI in the United States. Occasionally, however, New Central exported jute to the United States when no actual sale of the jute had been made. When this occurred, the jute would be delivered to the account of CTI as buyer and stored until market conditions were favorable to a sale. In these instances, the invoice was accompanied by a draft drawn by New Central on CTI, which CTI would accept in exchange for the documents of title to the jute. Generally, the drafts were payable within ninety days. If CTI had not managed to sell the jute within the ninety day period, CTI would require outside funds to pay the outstanding drafts. CTI would then turn to James Talcott, Inc., a factor, and the plaintiff-appellee herein, who would advance the needed funds in exchange for a first security interest in quantities of jute.

The relationship between New Central and CTI proceeded on the basis described above until 1964, when the 1959 agree-

ment expired. The parties attempted, but failed, to negotiate a new contract; and so in 1964 they ceased doing business together. At this time there was allegedly over $900,000.00 in drafts outstanding against CTI, and inventory in CTI's possession representing payments by CTI to New Central allegedly approximating $3,-500,000.00. CTI contends that New Central agreed to take over this inventory against payment to CTI of the cost plus expense incurred by CTI in holding the goods, and that in exchange CTI would pay the outstanding drafts of $900,000. According to CTI, however, New Central never paid the stated amount and CTI therefore sold certain of the jute over which it had control and reduced the claimed debt owing to approximately $1,-500,000.

## B. PREVIOUS LITIGATION

At this point, the Indian Banks, to whom New Central had negotiated the drafts, filed a suit of attachment against the remaining jute in Chatham County Superior Court, in the State of Georgia. The Banks were suing as purported holders of CTI's outstanding drafts, claiming that CTI was indebted on those drafts and was selling the property liable for the payment of the drafts to avoid payment of its debt. City Trade & Industries v. Allahabad Bank, Ltd. et al., 114 Ga.App. 12, 150 S.E.2d 182 (1966).

During the pendency of these attachment proceedings, the price of jute skyrocketed, so all the parties agreed to release the jute for sale to the order of James Talcott, Inc. Talcott was then to hold the fund derived from the proceeds, allegedly as a neutral stakeholder, awaiting a resolution of the various conflicting claims to the money.

Shortly after the sale of the jute, CTI instituted a separate proceeding in New York, in June 1965, against New Central for an accounting on their 1964 agreement. The suit, however, was not prosecuted by either party for two years, for reasons not entirely clear from the record, but apparently at the agreement and convenience of both parties.

Meanwhile, back in Georgia, the Indian Banks, on February 7, 1966, instituted garnishment proceedings in the Georgia courts against Talcott, who was holding the contested fund. And, not to be outdone, CTI sued Talcott on April 12, 1966, in the Supreme Court of the State of New York, claiming the sole right to the proceeds of the jute sale held by Talcott. Thus besieged, Talcott in October 1966 instituted this statutory interpleader action[3] in federal district court in Georgia.

As a result of Talcott's filing of the statutory interpleader action, and pursuant to the district court's authority to enjoin other proceedings in state or federal court affecting the property involved in the interpleader action,[4] the Indian Banks and CTI were restrained from further prosecuting their Georgia and New York suits against Talcott. The filing of the interpleader action, however, apparently revived CTI's interest in its New York suit for an accounting against New Central, and the prosecution of that previously dormant suit was renewed in 1967. Thus, while the instant suit was proceeding to its conclusion in

3. See 28 U.S.C. § 1335.

4. See 28 U.S.C. § 2361, which provides as follows:

In any civil action of interpleader or in the nature of interpleader under section 1335 of this title, a district court may issue its process for all claimants and enter its order restraining them from instituting or prosecuting any proceeding in any State or United States court affecting the property, instrument or obligation involved in the interpleader action until further order of the court. Such process and order shall be returnable at such time as the court or judge thereof directs, and shall be addressed to and served by the United States marshals for the respective districts where the claimants reside or may be found.

Such district court shall hear and determine the case, and may discharge the plaintiff from further liability, make the injunction permanent, and make all appropriate orders to enforce its judgment * * *.

Georgia, CTI's suit against New Central was also progressing separately in New York.

Since what happened in the New York courts in effect controlled the outcome of the suit below between CTI and the Indian Banks on the issue of collateral estoppel, we will describe the New York proceeding in more detail later in this opinion when we take up that issue. At this point, it is sufficient to say merely that the New York suit was an action for accounting by CTI against New Central under their original 1959 contract; that New Central defended by filing a motion to stay the suit until CTI carried out its obligations under a certain clause of their contract, which New Central contended required arbitration,[5] that CTI then responded, arguing among other things not relevant here, that New Central had waived its right under the contract to demand arbitration by instigating, through the Indian Banks as "alter egos" or "fronts," the attachment proceedings against CTI in Georgia. The trial court in New York, the Appellate Division, and the New York Court of Appeals each rejected CTI's "alter ego" contention flatly. City Trade & Industries, Ltd. v. New Central Jute Mills Co., 25 N.Y.2d 49, 302 N.Y.S.2d 557, 250 N.E.2d 52 (1969).

### I.

### CTI v. INDIAN BANKS

### A. PROCEEDINGS IN THE COURT BELOW

In the instant interpleader action, the Indian Banks asserted that they were en-titled to the entire fund placed in the registry of the court by virtue of their status as holders in due course of the notes secured by the fund. CTI answered that the Indian Banks were not holders in due course because they were acting merely as "alter egos" for New Central, and therefore were subject to all defenses existing between CTI and New Central. The Indian Banks then moved for summary judgment, setting up the judgment in the New York proceeding between CTI and New Central as a bar to relitigation of the "alter ego" issue in the subsequent proceeding. The district court undertook a careful examination of the pleadings and issues in the New York proceeding and concluded that the identical issue which CTI sought to raise in the instant action had been raised and "pursued to a conclusion at the behest of CTI" in New York, and that "the New York trial court held against CTI" on the point. 310 F.Supp. at 13. Thus, the district court concluded, since CTI could not relitigate its sole basis for opposition to the Indian Banks' claim, there was no material issue of fact in the case and summary judgment must be granted.

### B. SUMMARY JUDGMENT

■ At the outset, we are mindful that our duty in this case is to review the judgment of the district court under the very strict standard applicable to appellate review of summary judgment—that is, to determine whether there exists any genuine issue of material fact underlying this adjudication. Moore's Federal Practice ¶ 56.27[1]. Through-

---

5. The pertinent clause claimed to require arbitration provides as follows:

That in the event of any dispute or difference arising between the parties hereto in respect to this agreement, unless resolved amicably, the same shall be referred by either party for arbitration in India to the arbitration panel of the Federation of Indian Chambers of Commerce & Industry, New Delhi; or Indian Chamber of Commerce, Calcutta; or Bengal Chamber of Commerce & Industry, Calcutta; whichever of these three is chosen by CTI in their discretion, but that in the event of notification for such ar-bitration by NEW CENTRAL, CTI shall signify their choice within one month, and in case of no advice of choice by CTI, NEW CENTRAL would be free to refer to any of the bodies aforesaid. Arbitration award of the aforesaid would be fully binding on both the parties, and the provisions of the Indian Arbitration Act shall apply. In any such event, cost of CTI's representative's flying to India and his staying expense in India, up to a maximum [sic] of Rs. 10,000/, would be added to the cost of arbitration and would be borne or paid by the party or parties hereto as awarded.

out, we bear in mind that the party moving for summary judgment—the Indian Banks—had the burden of clearly establishing the lack of a triable issue of fact upon a record that is adequate to the legal issue presented; and that the moving party's papers are to be carefully scrutinized. At the same time, we note that this case involves a type of action, the very nature of which may lend itself to the summary judgment procedure. For the rights of a holder in due course of a negotiable instrument properly asserted, may cut off defenses that would raise factual issues and prevent summary judgment. United States v. McCulloch, E.D.N.Y.1939, 26 F.Supp. 7. Likewise, as a general rule, actions involving affirmative defenses such as collateral estoppel, may be more amenable to a summary adjudication than others. Moore's Federal Practice ¶ 56.15[8].

With these broad guidelines in mind, we turn to a consideration whether there is any genuine issue of material fact underlying the adjudication below. Our analysis of the issues is dictated by the procedural structure of an action on a negotiable instrument brought by a purported holder in due course.

## C. PRODUCTION OF THE INSTRUMENTS

In a suit on negotiable instruments, the burden is initially on the party suing on the instruments to show *first* that he is a *holder* of the instruments sued on. UCC § 3–302; Hawkland, Cases on Commercial Paper and Bank Deposits and Collections 183 (1967). A "holder" is "a person who is in possession of a document of title or an instrument or an investment security drawn, issued or indorsed to him or to his order or to bearer or in blank." UCC § 1–201(20). The most obvious way for a holder to establish that he is a holder of instruments sued on, of course, is to produce the instruments in evidence.[6] In

the instant case, however, the Indian Banks *at no time* produced the contested instruments in the court below. Instead, the Banks in their original interpleader answer stated that *copies* of the instruments were attached to and made a part of the attachment proceedings [discussed above] filed in the Superior Court of Chatham County, Georgia. CTI's pleadings and affidavits filed in response to the Banks' reference to these copies attached to the pleadings in the Georgia suit are ambiguous at best. Nowhere, for example, did CTI assert that the copies were not verified or true copies of the trade acceptances. In addition, in its pleadings CTI never actually denied that the Banks were in possession of the trade acceptances, and it several times referred to the instruments as "the trade acceptances or bills of exchange held by the [defendant Banks]."

Nevertheless, CTI did raise some questions concerning the whereabouts of the instruments and the Banks' control of them. For example, in one affidavit counsel for CTI stated on information and belief that the instruments were "owned and controlled by New Central, notwithstanding the same are alleged to be held by [defendant Banks]." CTI also raised questions in its interrogatories with respect to the location of the trade acceptances and at one point asserted that the trade acceptances are not genuine. While the issue of the Banks' possession of the instruments perhaps was inartistically delineated by CTI, we think CTI's pleadings, affidavits and interrogatories are sufficient to raise a question whether the Banks actually were in possession of the instruments. We are not, after all, analyzing CTI's papers opposing summary judgment under a discriminating lens; on the contrary, the law requires that the papers of a party opposing summary judgment are to be "treated indulgently." Bohn Aluminum & Brass Corp. v. Storm King Corp., 6th Cir. 1962, 303 F.2d 425.

---

6. UCC § 3–307(2) provides that [w]hen signatures are admitted or established, *production of the instru-* *ment* entitles a holder to recover on it unless the defendant establishes a defense. (Emphasis added).

The movant's papers, on the other hand, are to be closely scrutinized. Moore's Federal Practice ¶ 56.15[3]. It is the movant's burden to exclude any real doubt as to the existence of any genuine issue of material fact. National Screen Service Corp. v. Poster Exchange, 5th Cir. 1962, 305 F.2d 647. And it is the movant Banks' failure to carry this burden that convinces us that summary judgment on the issue of possession must be reversed. See Adickes v. S. H. Kress and Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). For in the instant case there is a real doubt in our minds as to the Banks' possession of these instruments, created by the Banks' own failure to produce the instruments in support of their motion for summary judgment. The Banks urge us to rely on the copies affixed to the Georgia attachment proceedings. But nowhere is there proof that these were true copies of the trade acceptances, and even those copies were never produced in the court below. The Banks assert in a supplemental memorandum presented to this Court on request that "they were (and still are) in actual possession of the trade acceptances." Thus, they seem to suggest, it would be wasteful to remand this case for a full-fledged determination on this simple issue of possession, when we could determine here and now that they do possess the instruments. But the simple truth is that on the Record we have before us, we are incapable of concluding beyond a doubt that the Banks are "holders." That the issue of actual possession is a simple one to prove should not mislead us into underestimating the significance of the issue. In a suit on a negotiable instrument, possession is in a very real sense "nine-tenths of the law." Possession establishes a prima facie case of ownership. Leathers v. Turner, 75 Ga.App. 62, 41 S.E.2d 921 (1947). And proof of possession by production of the instrument entitles the holder to recover on it unless the opposing party establishes a defense. U.C.C. § 3–307(2). *Cf.* Pitillo v. Demetry, 112 Ga.App. 643, 145 S.E.2d 792 (1965). On the other hand,

if the Banks cannot produce the instruments, they will lose the benefit of the presumption of ownership, and the case might very well be determined on that issue. It is thus essential that summary judgment on the issue of possession be reversed and the case be remanded for a full-fledged determination of that issue.

## D. COLLATERAL ESTOPPEL

If the Banks are able to produce the instruments in suit on remand the question will then arise whether CTI can lawfully raise its "alter ego" defense to the Banks' holder in due course status, or is precluded from raising the defense by the collateral estoppel effect of the New York judgment. Because of the possibility that the parties will reach this issue on remand, we deem it necessary to decide the issue now. As we stated earlier, the district court awarded summary judgment on the holder in due course issue because CTI was precluded from raising its defense by collateral estoppel. This ruling comports with the principle that production of an instrument entitles a holder to recover on the instrument unless the defendant establishes a defense, and that the burden of proving that one is a holder in due course does not shift to the holder until it is shown that a defense exists. U.C.C. § 3–307(2), (3). Summary judgment was therefore clearly correct if the Banks' collateral estoppel defense was good, for the genuine issue of fact that CTI sought to raise would have been foreclosed. On the other hand, it is clear that summary judgment was incorrect if the Banks' collateral estoppel defense was not good. Our task is therefore limited to considering whether collateral estoppel should have been applied.

The traditional threshold requirements for application of the doctrine of collateral estoppel are that (1) the issue to be concluded must be identical to that involved in the prior action; (2) in the prior action the issue must have been "actually litigated"; and (3) the determination made of the issue in the prior action must have been neces-

sary and essential to the resulting judgment. *See* Restatement of Judgments § 68 (1942), Moore's Federal Practice ¶ 0.433 [1]; Scott, Collateral Estoppel by Judgment, 56 Harv.L.Rev. 1, 4–5 (1942). If any one of these requirements is lacking, there is no collateral estoppel.

■ After a careful examination of the pleadings and opinions in the New York action,[7] we have concluded that the "alter ego" issue in New York as litigated and adjudicated was identical to the "alter ego" issue in the interpleader action below. CTI's "alter ego" argument consists of a number of ostensibly separate, but actually overlapping charges made by CTI in New York to support its contention that the Banks were suing CTI in Georgia as "fronts" for New Central; and in the instant interpleader action to support its contention that the Banks are not holders in due course. Point for point, and almost word for word, CTI made the same charges in New York with respect to New Central's relationship with the Banks that it made below. Specifically, CTI charged both in New York and below that the Banks were "alter egos" of New Central because (1) the trade acceptances had been paid by New Central directly to the Banks [Appendix p. 17 and p. 373]; (2) the Banks were acting as collecting agents for New Central in the Georgia action [Appendix pp. 17, 21 and p. 382]; (3) the Banks had actual knowledge that CTI was New Central's exclusive distributor and selling agent and not a purchaser [Appendix pp. 45–47 and pp. 364–367]; (4) the trade acceptances were owned and controlled by New Central [Appendix p. 51 and p. 375]; and

(5) New Central was the real party in interest in the Georgia actions, while the Banks were acting only as straw plaintiffs for New Central [Appendix p. 61 and p. 308].

■ CTI seems to argue that the issues were not identical, however, since a finding that the Banks were not New Central's alter-egos for the purpose of bringing the Georgia attachment suits does not mean that they would not be "alter-egos" for other purposes not connected with the attachment suits. That different legal conclusions may flow from a single fact finding, however, does not alter the existence of that fact finding. The distinguishing feature of the doctrine of collateral estoppel is that it precludes in a second or subsequent suit the relitigation of fact issues actually determined in a prior suit *regardless of whether the prior determination was based on the same cause of action* in the second suit. Lawlor v. National Screen Service Corp., 349 U.S. 322, 326, 75 S.Ct. 865, 867, 99 L.Ed. 1122 (1955), Seguros Tepeyac, S.A., Compania Mexicana v. Jernigan, 5th Cir. 1969, 410 F.2d 718, 726, cert. denied, 396 U.S. 905, 90 S.Ct. 219, 24 L.Ed.2d 181. We cannot accept, therefore, CTI's suggestion that a fact issue determined in one suit loses its validity in a subsequent suit involving a different cause of action simply because that fact determination is proffered to support a different legal theory.[8]

■ Having determined that the "alter ego" issues in each case were identical, we turn to a consideration whether they were "actually litigated" in the prior action. As a general rule, where a question of fact is put in issue

---

7. It is established that in discovering what issues were determined by the judgment in a prior action, the court in the second action is free to go beyond the judgment roll and may examine the pleadings and the evidence in the prior action. The Evergreens v. Nunan, 2d Cir. 1944, 141 F.2d 927, cert. denied, 323 U.S. 720, 65 S.Ct. 49, 89 L.Ed. 579.

8. There are circumstances when the same historical factual circumstance may be involved in two actions, but the legal significance of the fact differs in the two actions because different legal standards are simultaneously applicable to it. *See, e. g.,* Capps v. Whitson, 157 Va. 46, 160 S.E. 71 (1931). This is a very narrow exception to the rule with respect to identity of issues, however, and is applicable only when there is a demonstrable difference in the legal standards by which the facts are evaluated. *See* Moore's Federal Practice ¶ 0.443 [2].

by the pleadings, and is submitted to the jury or other trier of facts for its determination, and is determined, that question of fact has been "actually litigated." Restatement of Judgments § 68, comment (c) (1942).

There is no question that CTI's "alter ego" contention was put in issue in the New York proceedings. CTI clearly urged the "alter ego" contention as grounds for avoiding the arbitration provision of its contract with New Central, and New Central clearly denied that any such "alter ego" relationship existed. Moreover, the issue was clearly adjudicated by the New York courts. The trial court ruled expressly on the alter ego issue, as did the Appellate Division and the Court of Appeals. Although the New York courts made no express findings of fact on each charge made by CTI in support of its "alter ego" contention, it is a necessary inference that the New York court determined that there was no merit to any of the charges since CTI would have prevailed in the matter it was urging on the New York courts if the New York courts had accepted as true any of CTI's contentions. Moore's Federal Practice ¶ 0.443 [4]. This was the conclusion of the court below, and with that conclusion we agree. Concomitantly, the fact that judgment in the New York action could not have been rendered in New Central's favor unless all of CTI's contentions with respect to the Banks' relationship with New Central had been rejected establishes that the New York courts' decision of the "alter ego" issue was necessary to the judgment, which is the last of the traditional threshold prerequisites to application of the doctrine of collateral estoppel. Restatement of Judgments § 68, Comment (m) (1942).

CTI seems to argue nevertheless that the New York courts' holding was unnecessary to the judgment for another reason. CTI seizes upon certain language of the Supreme Court of New York County, which stated that "the actions instituted in [Georgia and Delaware] were brought by banks *who*

*were holders in due course of the drafts* executed by plaintiff"; and other language in the opinion of the Court of Appeals, which stated with reference to the Georgia and Delaware actions, that "[i]n each case, the bank *asserted its status as holder in due course* of a draft received by them." (Emphasis added) CTI then argues that these statements were unnecessary to the decisions in the New York courts and that any reference to the Banks as holders in due course by the New York court was mere dictum. Therefore, CTI argues, the court below erred in holding "the New York decision to act as a collateral estoppel against CTI on the issue of holder in due course status of the Indian Banks." We agree with CTI that the New York courts' reference to the Banks as "holders in due course" were unnecessary to their decisions. But we disagree with CTI's assertion that it was the "holder in due course issue" which the court below held to be collaterally estopped by the New York judgments. It is quite clear, and CTI states this in its own brief, that the only finding the New York courts made was that "CTI had not met its burden of proof to demonstrate that the Indian Banks were the alter egos of New Central in the Georgia and Delaware actions." [Appellants' Brief at 18]. And this very same "alter ego" issue is the issue which the court below concluded was foreclosed by the New York judgments. The court below did not hold that CTI was estopped on the issue of holder in due course because it never *reached* the issue of holder in due course. As long as CTI was estopped from raising its "alter ego" defense—which was the only defense it raised—the Banks could recover merely by producing the instruments.

We are therefore in complete agreement with the court below that the traditional prerequisites to collateral estoppel have been satisfied in this case: The "alter ego" issue sought to be relitigated by CTI was identical to the "alter ego" issue raised in the New York courts; the issue was "actually litigated" in New York; and the New York courts' deter-

mination of the issue was necessary to their decisions.

There has been until recently, however, another traditional prerequisite to application of the doctrine of collateral estoppel—the "mutuality" requirement, which prevents a litigant from invoking the conclusive effect of a judgment unless he was a party or in privity with a party to the suit in which the prior judgment was rendered. But since the landmark case of Bernhard v. Bank of America Nat'l Sav. & Trust Ass'n, 19 Cal. 2d 807, 122 P.2d 892 (1942), this "doctrine of mutuality" has been steadily eroded. *See, e. g.,* Currie, Mutuality of Collateral Estoppel: Limits of the Bernhard Doctrine, 9 Stan.L.Rev. 281 (1957); Currie, The Contributions of Roger J. Traynor—Civil Procedure: The Tempest Brews, 53 Calif.L.Rev. 26 (1965). The most recent case in this Circuit discussing the trend away from the doctrine of mutuality is Rachal v. Hill, 5th Cir. 1970, 435 F.2d 59. *See also* Seguros Tepeyac, S.A., Compania Mexicana v. Jernigan, 5th Cir. 1969, 410 F.2d 718, cert. denied, 396 U.S. 905, 90 S.Ct. 219, 24 L.Ed.2d 181. The main reason advanced for abandoning the doctrine of mutuality has been that "no satisfactory rationalization" exists for adhering to the doctrine. *See* Bernhard v. Bank of America, 19 Cal.2d at 812, 122 P.2d at 894–895. *But see* Moore's Federal Practice ¶ 0.412 [1].

 Thus, it has been argued, if a party has had his day in court with a full and fair opportunity to litigate his issue, why should he be permitted a second opportunity to litigate the same issue in a subsequent suit simply because he has a different adversary? A *growing number of courts have been*

persuaded by this argument and have abandoned the doctrine. Included in the roster of nonmutuality jurisdictions is New York, whose law we must apply on this issue of collateral estoppel.[9] In a series of opinions, the New York courts have abandoned mutuality in favor of a test calling for application of collateral estoppel whenever the party against whom the prior judgment is asserted has had a "full and fair opportunity" to litigate the issue in the prior suit. Schwartz v. Bronx City Public Administrator, 24 N.Y.2d 65, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969); B. R. DeWitt, Inc. v. Hall, 19 N.Y.2d 141, 278 N.Y.S.2d 596, 225 N.E.2d 195 (1967); Cummings v. Dresher, 18 N.Y.2d 105, 271 N.Y.S.2d 976, 218 N.E.2d 688 (1966); Israel v. Wood Dolson Co., 1 N.Y.2d 116, 151 N.Y.S.2d 1, 134 N.E.2d 97 (1956). *See also,* Note, Collateral Estoppel: The Demise of Mutuality, 52 Cornell L. Quar. 724 (1967). This standard obviously necessitates a case-by-case approach to application of the doctrine, but certain indicia of fairness may be relied upon to determine whether the doctrine should be applied in any particular case, *without having to evaluate the prior judgment on its merits.* According to the commentators, the most dependable indicator of fairness is the posture in the prior suit of the party against whom collateral estoppel is urged. If that party lacked the initiative in the previous suit, any number of considerations may have hampered his opportunity to litigate. For instance, if in the prior action the party was defending against a relatively small claim, he may not have been motivated to litigate as vigorously as possible and it could be thought unfair in subsequent litigation when much more

9. Under the applicable conflicts of law principle in interpleader actions, a federal court applies the choice of law rules of the state in which it is sitting. Griffin v. McCoach, 313 U.S. 498, 61 S.Ct. 1023, 85 L.Ed. 1481 (1941); Moore's Federal Practice ¶ 22.14 [5]. Thus we look to Georgia choice of law rules to determine what law to follow on the question of mutuality. Since we have been unable to find a Georgia case precisely in point on this question, we conclude that Georgia follows the general rule that the law of the state where the judgment in question was rendered determines the question of mutuality. Restatement, Conflict of Laws § 450, comment (d). *See* Behrens v. Skelly, 3d Cir. 1949, 173 F.2d 715, cert. denied, 338 U.S. 821, 70 S.Ct. 66, 94 L.Ed. 498.

may be at stake to hold him to the prior adverse judgment. *E. g.* Berner v. British Commonwealth Pac. Airlines Ltd., 2d Cir. 1965, 346 F.2d 532, 540, cert. denied, 382 U.S. 983, 86 S.Ct. 559, 15 L.Ed.2d 472 (1966). It also may be thought unfair to bind a party to a judgment rendered in a forum which he had no opportunity to choose or change. *Cf.* Zdanok v. Glidden Co., 2d Cir. 1964, 327 F.2d 944, 956, cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964). Thus, when the party against whom the adverse judgment is asserted lacked the initiative in the prior action, the courts are disposed to examine the circumstances under which the prior judgment was rendered to ascertain the fullness and fairness of his previous opportunity to litigate. If they determine that his inability to choose a forum had no prejudicial effect, that he had a pressing motive to litigate fully, that there was extensive litigation of the issues, the prior judgment will be given effect regardless of his defensive position in the prior suit. If the party against whom the prior judgment is asserted did have the initiative in the prior suit, however, in the sense that he instigated the suit, there would appear to be *no reason* to assume that he did not have a full and fair opportunity to litigate. Thus, there is no reason to assume that he lacked sufficient *motive* to litigate when it was he himself who commenced the litigation. Similarly, it would be anomalous to consider the fairness of his forum when it was he himself who chose the forum. In short, a party who instigated the prior suit is in a poor position to complain about the adequacy of his *opportunity* to litigate in that suit.

It was this consideration of CTI's posture in the New York proceedings that seemed greatly to influence the court below. For the court made a point of the fact that the suit was instigated in New York at CTI's behest; that CTI enjoyed the privilege of choosing a forum and the position of taking the offensive; and that CTI prosecuted the issue fully on appeal from the trial court to both the Appellate Division and the New York Court of Appeals. Moreover, the court below noted, and we note on this appeal, that CTI nowhere complained that it was in any way inhibited from making additional proof on the issue in New York.[10] The simple truth is that CTI chose to prosecute the claim in New York and failed to convince the New York courts that there was any merit to its case. It is fundamental that "[i]f an issue is raised and the party who has the burden fails in his proof and the issue is decided against him, he is just as much bound by collateral estoppel as though he had presented a barrel of testimony." *See also* United States v. Silliman, 3d Cir., 167 F.2d 607, 617, cert. denied, 335 U.S. 825, 69 S.Ct. 48, 93 L.Ed. 379 (1948); Partmar Corp. v. Paramount Pictures Theatres Corp., 347 U.S. 89, 101, 74 S.Ct. 414, 98 L.Ed. 532 (1954).

There is another reason why we see no unfairness in applying the doctrine of collateral estoppel in this case. Much of the seeming unfairness of the doctrine stems from its availability in *any* subsequent suit where the identical issue is raised, regardless of how unforeseeable the action may be, and notwithstanding that an entirely different cause of action may be involved. It is this potential for remote application that has given the doctrine of collateral estoppel a bad reputation and that has prompted the remark that collateral estoppel is "an extremely dangerous instrument." Currie, Mutuality of Collateral Estoppel: Limits of the Bernhard Doctrine, 9 Stan. L.Rev. 28, 289 (1957); Moore's Federal Practice ¶ 0.441. *See also* The Evergreen v. Nunan, 2d Cir. 1944, 141 F.2d 927.

---

10. It has been suggested that the burden should be on the party against whom the judgment is asserted to raise the issue and to affirmatively show that he did not have a full opportunity to litigate. *See* Thames, Mutuality in Collateral Estoppel: Never the Twain Should Meet, 37 Miss.L.J. 244, 253 & n. 25 (1966).

In the instant case, however, not only was the subsequent suit in which the alter ego issue was raised "reasonably foreseeable," *but the suit also was being tried simultaneously with the New York suit.*

We are thus persuaded that not only are all the requirements of collateral estoppel fulfilled in this case so that the doctrine is logically applicable, but that application of the doctrine in this case would occasion no unfairness. To be sure, we recognize that whenever a court considers applying the doctrine of collateral estoppel, there is always a lingering question whether the party might have succeeded in proving his point if he had only been given a second chance at producing evidence. Without more, however, this question is not sufficient to outweigh the extremely important policy underlying the doctrine of collateral estoppel—that litigation of issues at some point must come to an end.

To recapitulate our position up to this point, we have concluded that if the Banks can produce these instruments on remand, they will be entitled to recover as holders of the instruments. It will be unnecessary for the Banks to offer any proof that they are holders in due course because the burden of proving holder in due course does not shift to a holder until a defense is raised by the opposing party. In this case, the only defense CTI has sought to raise is its "alter ego" defense, and we have concluded that it is collaterally estopped from raising that issue because (1) CTI raised the claim that the Banks were "alter egos" of New Central in the New York proceedings; (2) the operative facts of the "alter ego" claim in New York were identical to the operative facts of CTI's "alter ego" defense in the instant proceeding; (3) CTI litigated the "alter ego" issue at its own behest all the way through the New York courts; and (4) the New York courts rejected the claim on grounds that CTI had failed to meet its burden of proof on the issue. Thus, since CTI is collaterally estopped from raising its only proffered defense to the

Banks' suit on these negotiable instruments, the holder-in-due-course status of the Banks will never be put in issue and the Banks will be able to recover merely by producing the instruments.

## E. INTEREST ON THE FUND

The court below, after granting the Banks' motion for summary judgment, ordered the Clerk of the court to pay out to the Banks all the funds deposited in the registry of the court, including the interest that had been earned on the funds while they were held by Talcott, and later while they were on deposit in interest-bearing accounts in several Georgia banks, awaiting the outcome of this litigation. 310 F.Supp. at 15. CTI argues on this appeal that the Banks are not entitled to interest on their claim because

> they are estopped by conduct to demand interest on the purported trade acceptances in the circumstances in this case because the place of deposit, the time of deposit, and all arrangements regarding the deposits were under the sole control of themselves and Talcott.

CTI cites nothing in the Record that would support this contention. Furthermore, it cites no authority that would explain why this contention, even if it could be substantiated, is relevant. We see no merit whatever to CTI's argument on this point. There is no reason why interest accruing on a contested fund during litigation over the fund should not be awarded to the winner of the fund. We therefore conclude that the district court committed no error in awarding the fund plus accrued interest to the Indian Banks.

### III

### CTI v. NEW CENTRAL

In addition to the contest between CTI and the Indian Banks below, there was also a controversy between CTI and New Central, engendered by CTI's attempt to bring New Central into the suit by means of a third-party action. CTI's apparent

purpose in filing the third-party action against New Central was to recover over against New Central in the event the Banks recovered to the exclusion of CTI. The third party action was sanctioned by the court below, and in an order dated April 3, 1967, the court authorized service to be made upon New Central. On August 19, 1967, and on three subsequent days, a summons was published in the *Savannah Evening Press,* of Savannah, Georgia, commanding the appearance of New Central pursuant to "Rule 14 and Rule 4(7) (e) (i) (A) (B) (C) (D) (E) (2), U.S.C.A., as amended, and Sections 81–204, 205, 207.- 1 Ga.Code Ann." The Clerk of the Court on August 21, 1967, sent by registered mail a copy of the *Savannah Evening Press* for August 19, 1967, containing the notice to New Central's office at 11 Clive Row, Calcutta, India.

Counsel for New Central, on October 31, 1967, filed an Objection to the Attempted Service of Process and Motion to Quash, on the ground that any service attempted was invalid and unauthorized by statute, law or rule.

The court below on May 8, 1968, entered an order adjudging that service upon New Central was perfected, but that the order should be "without prejudice to the pending Motion of Third Party Defendant to quash and set aside any return of service, thereon, including service by publication." Ultimately, the matter came to be heard on the motion to quash, and the court entered an order on October 24, 1969, granting the motion to quash and dismissing the third party complaint for failure of service of process.

CTI appeals from the dismissal of its third-party complaint contending (1) that New Central was before the court; (2) that New Central was properly served; and (3) that New Central had been represented by counsel of its choice at every state [sic] of the proceedings.

In connection with its first contention, CTI states that "a cursory review of the record will disclose that counsel for the Indian Banks filed repeated motions and objections on behalf of New Central prior to its present counsel of record entering an appearance in the case." The "repeated motions and objections" to which CTI refers were two motions by the Banks to dismiss the third-party complaint on grounds that service of process on New Central was not authorized by statute or rule. CTI invites us to infer from these motions filed by the Banks that counsel for the Banks were in fact representing New Central, and thus that New Central was "before the court."

■ There is obviously no merit whatever to this contention. In the first place, Rule 14, F.R.Civ.P. clearly provides that "[a]ny party may move to strike the third-party claim." Thus, the Banks were acting fully within their rights in opposing the claim, and no inference of deceptive conduct on their part may be drawn from their participation in the case on this point. *See also* Moore's Federal Practice ¶ 14.18[2.—2]. In the second place, the Record affirmatively shows that when counsel of record for New Central first appeared in this case, it appeared specially, and without submitting to the jurisdiction of the court, for the limited purpose of objecting to the attempted service of process on New Central in the third-party action. We therefore reject CTI's contention that New Central was at all times "before the court."

■ CTI's second contention is that New Central has been properly served and is therefore subject to the jurisdiction of the court. The relevant question we must answer on this point is whether the method by which service was attempted on New Central was authorized by statute or rule.[11] The court below held that it was not.

---

11. In its brief on this point, CTI has made a rather elaborate argument which apparently is based on a misunderstanding of the differences between subject matter jurisdiction and venue and subject matter jurisdiction and personal jurisdiction.

The attempted method was service by publication. Service by publication on a foreign corporation in actions of this type is authorized by neither federal statute nor rule. According to Rule 4(d) (7), F.R.Civ.P., however, service may be made on a foreign corporation "if the summons and complaint are served in the manner prescribed by * * * the law of the state in which the district court is held * * *." The Record in this case shows that service was made by publication pursuant to Ga.Code Ann. tit. 81–204, 205, 207.1. The court below held, however, that CTI's third-party action against New Central was in the nature of an action *in personam;* and that, while Georgia statutes have provisions for extra-territorial service in certain cases *in rem* Georgia law does not provide for the service by publication or otherwise upon nonresidents in actions *in personam.* The district court was correct in this conclusion. Georgia courts interpreting the above statutes have consistently held over the years that judgments *in personam* cannot validly be rendered against nonresident defendants where service is had only by publication.[12] Sternbergh v. Mc-

---

CTI's first contention reads substantially as follows:

> In attempting service of process upon New Central, CTI as third party plaintiff contended that the rule [presumably Rule 4, F.R.Civ.P.] did not require an independent jurisdictional basis "because a third party claim" is treated as ancillary for jurisdictional purposes.

The proposition that there need be no independent jurisdictional basis for a third-party claim is, of course, true, C. Wright, Law of Federal Courts § 76, at 336 (1970), but it has nothing whatever to do with acquiring in personam jurisdiction by service of process. Ancillary jurisdiction is a concept having to do with the subject matter jurisdiction of the federal courts, Wright, *supra,* at § 9; and it is clear that even though a court has ancillary jurisdiction of a claim, personal jurisdiction over the third party defendant must be secured by proper service of the third party summons. Wright & Miller, Federal Practice and Procedure: Civil § 1063 (1969); 1A W. Barron and A. Holtzoff, Federal Practice and Procedure § 424, at 660 (Wright ed. 1960).

Next CTI refers this Court to 28 U.S.C.A. § 1391(d), which provides that "[a]n alien may be sued in any district." From this provision, CTI concludes that "if an alien 'may be sued,' it follows that an alien may be served." Section 1391, of course, is a venue statute, and again, it has nothing whatever to do with acquiring personal jurisdiction by service of process. Wright & Miller, *supra.* Thus, even though New Central could be sued for venue purposes in any district in the United States, it still had to be properly served with process.

12. Section 81–204 provides as follows:
81–204. *Service on nonresidents.*—If the defendant in an equitable proceeding shall not reside in the State, service of the petition or any order of the court may be made by publication. If the nonresident defendant shall be represented in court by an attorney at law or in fact service on such attorney shall be sufficient. In all cases not embraced within the foregoing provisions, the judge may prescribe extraordinary service according to the exigencies of each case.

Section 81–205 provides as follows:
81–205. *Service by publication; nonresidents or unknown owners or claimants.*—Where any nonresident or person unknown shall claim or own title to or an interest, present or contingent, in any real or personal property in this State, service on such nonresident or unknown owner or claimant may be made by publication in cases affecting such property where proceedings are brought—

1. To remove a cloud therefrom or quiet title thereto.

2. To cancel or set aside deeds, mortgages, liens, or incumbrances thereon.

3. To establish, force, or foreclose liens thereon.

4. To enforce, by decree for specific performance, any contract in reference thereto.

5. To order the partition thereof by division or sale.

6. To make any decree or order in which the subject of the action is real or personal property in this State, in which a nonresident or unknown person has or may have or claims an interest, actual or contingent, and in which the relief demanded consists wholly or in part in excluding him from an interest therein.

7. Where a nonresident or person unknown has or may have or may claim a present, future, or contingent interest in any property in this state.

Clure, 217 Ga. 278, 122 S.E.2d 217 (1961); Pettie v. Roberts, 214 Ga. 750, 107 S.E.2d 657 (1959); Little v. King, 211 Ga. 872, 89 S.E.2d 511 (1955); Irons v. American National Bank, 175 Ga. 552, 165 S.E. 738 (1933); Hood Brick Co. v. Mangham, 161 Ga. 457, 131 S.E. 172 (1925); King v. Sullivan, 93 Ga. 621, 20 S.E. 76 (1894). And since no method other than publication was attempted in serving process on New Central, the court below was correct in its decision to grant the motion to quash service.

CTI's final contention with respect to the dismissal of its third-party complaint —that "New Central had been represented by counsel of its choice at every state [sic] of the proceedings"—is simply an endeavor to raise again its first contention that New Central was "before the court." We have already rejected this argument.

Since we are unpersuaded by CTI's charge that New Central was "before the court" during this entire proceeding, and we are in agreement with the district court's decision to grant the motion to quash, we affirm the order dismissing CTI's third-party action against New Central.

### IV.

### CTI v. TALCOTT

 We come now to the final dispute of these long and arduous proceedings—the dispute between CTI and Talcott. The Record discloses that soon after Talcott filed this statutory interpleader suit and deposited the contested fund in the registry of the court, it requested to be discharged from the suit and awarded attorneys' fees pursuant to 28 U.S.C.A. § 2361. CTI opposed this motion and sought to set up a counter-

---

8. And in all cases in which such person may have or claim any interest in any trust estate in this State, and it becomes necessary or proper or advantageous to order a sale of the whole or any part of such property, service upon such nonresident or unknown person may be perfected by publication.

The provisions of this section shall be supplemental to the other provisions in this Code providing for service by publication.

Section 81–207.1 provides as follows:

81–207.1 *Service by publication in other than divorce cases; how made.—* In all cases, other than actions for divorce, where service by publication is permitted under the law and where the defendant or other party shall reside out of this State, and it shall be necessary to perfect service upon such person by publication, upon the fact being made to appear to the judge of the court in which suit is pending, either in term or vacation, said judge may order service to be perfected by publication in the paper in which sheriff's advertisements are printed, four times within the ensuing 60 days, publications to be at least seven days apart. Said published notice shall contain the name of the parties plaintiff and defendant, with a caption setting forth the court, the character of the action, the date the action was filed, the date of the order for service by publication, and a notice directed and addressed to the party

to be thus served, commanding him to be and appear at the court in which the action is pending within 60 days of the date of the order for service by publication and shall bear teste in the name of the judge, and shall be signed by the clerk of said court. The date upon which the nonresident is called upon to appear shall be the appearance day of the case.

In our study of this case, we discovered that in 1966 the above-quoted statutes were "repeal[ed] for certain purposes" by the Georgia legislature. Ga.Code Ann. tit. 81–204, 205, 207.1 (Supp. 1969). No mention was made of this rather significant fact by either CTI or New Central in their briefs. We do not believe it is necessary to explore the point, however, for regardless of whether the statutes were repealed for the purposes of the service in the instant case, the outcome of this case will be the same. Thus, if the purposes for which the statutes were repealed coincided with the purposes of service of process in the instant case, the attempted service would have been invalid for being issued pursuant to a nonexistent statute. On the other hand, if the statutes were still in force for purposes coinciding with the instant case, then the case law under the statutes forbidding service by publication on nonresident defendants in actions *in personam* would render the service invalid.

claim against Talcott in which it charged Talcott with numerous breaches of its fiduciary responsibilities in managing the fund.

On August 21, 1967, the court below entered an order discharging Talcott, awarding its $25,000 in attorneys' fees, and denying CTI's application to set up a counterclaim against Talcott. [Appendix at 167] A final judgment was never entered on this order, however, and in a later order, the district court construed CTI's counterclaim and the prior order as follows:

> CTI also filed a counterclaim against the plaintiff Talcott in the interpleader action which, in oral argument before the Court counsel stated is based solely on the contention that Talcott owed interest on the amount it held in excess of Talcott's own claims during the period prior to paying the funds into Court, and possibly, subsequent to that date, to the extent that the funds drew either no interest or less than the legal rate after deposit in the Court.

> Upon subsequent motion by Talcott [the court] entered an order authorizing payment of $25,000 attorneys' fees for Talcott's counsel and discharging Talcott from any further liability with respect to the funds deposited. The order made no reference to, and therefore did not in any way dispose of the counterclaim by CTI against Talcott. I construe the order as merely discharging Talcott from any further liability *with respect to the funds actually deposited by it in this Court.*

310 F.Supp. at 9. This later construction of the prior order is rather confusing, since the prior order of the court did specifically mention CTI's counterclaim and disallow it. Moreover, at no subsequent point in its orders before entering final judgment did the trial court refer again to CTI's counterclaim. In its brief on this appeal, CTI states in its fourth point of error that "the final order of the court has retained CTI's counterclaim against Talcott in a pending status," but in the very same breath CTI urges that "CTI's counterclaim * * * should not have been dismissed for failure to state a claim." [Appellant's brief at 39–40]. The posture of CTI's counterclaim is thus in a state of hopeless confusion. We cannot tell from the trial court's final order or from CTI's brief whether the counterclaim has been severed for separate consideration or dismissed for failure to state a claim. Indeed, it is not even clear that the counterclaim is before us on this appeal.[13]

In addition, the scope of the counterclaim is a mystery. For while the trial court wrote in its opinion that CTI's counsel stated in oral argument that it wished to limit the counterclaim to an accounting for interest, CTI in its brief on this appeal contends that the trial court "misunderstood CTI's position" on this point. We are also unable to resolve this dispute because no record was kept of the hearing below on Talcott's motion for discharge.

On remand, therefore, the trial court should clarify its order on both the status and scope of CTI's counterclaim against Talcott, and dispose of the issue accordingly.

Finally, CTI appeals from the district court's award of attorneys' fees

---

13. Talcott has argued on this appeal that a counterclaim may not properly be interposed against a stakeholder in interpleader when the stakeholder has asserted no claim to the fund in suit. *See* The Erie Bank v. United States District Court, 10th Cir. 1966, 362 F.2d 539; The First Nat'l Bank v. Johnson County Nat'l Bank and Trust Co., 10th Cir. 1964, 331 F.2d 325, 327; 1A W. Barron & A. Holtzoff, Federal Practice and Procedure § 398 (Supp. 1970, Wright ed.). *But see* 3A Moore's Federal Practice ¶ 22.15 n. 6. Since we are not even clear that the counterclaim is properly before us on this appeal, we decline to rule on this contention. The proper time for us to decide whether a counterclaim should have been allowed is after, not before, the district court has considered the question and ruled on it.

in the amount of $25,000 to Talcott. It does not attack the amount of the award, but contends that Talcott was not entitled to any award at all because Talcott acted in collusion with the Indian Banks. CTI's charges of collusion are totally unsupported by the Record. The law is clear that a district court has the authority to award within its discretion stakeholder costs, including a reasonable attorneys' fee in interpleader actions. Moore's Federal Practice ¶ 22.16[2]. We affirm the award in this case.

## V.

### CONCLUSION

Our disposition of this appeal is to reverse and remand for further proceedings not inconsistent with this opinion on the issue of the Banks' possession of the instruments in suit, to remand on the issue of CTI's counterclaim against Talcott, and to affirm the judgment appealed from in all other respects.

Affirmed in part; remanded in part; reversed and remanded in part.

AINSWORTH, Circuit Judge (dissenting):

I am in agreement with much of the excellent majority opinion. However, I dissent from that portion of the opinion which affirms the granting below of summary judgment, based on the plea of collateral estoppel by judgment of the Indian Banks (Allahabad, Baroda and Tokyo) against City Trade & Industries, Ltd.

Thus on summary judgment, without a requested jury trial on the merits, and despite strenuous contentions of CTI as to important disputes on material facts, CTI is barred from claiming a large interpleader fund of $622,367.76 plus interest, on the basis of a New York State judgment, similarly granted on motion for summary judgment, in a proceeding in which the Indian Banks were not even parties.

I agree with the majority that this case must be remanded to require that the Indian Banks produce, if they can, the negotiable instruments (trade acceptances) upon which they assert claim to the entire interpleader fund. However, the case is reversed and returned to the District Court for a trial solely on that issue. The majority declines to require also a trial on the merits of the crucially important question of whether the Indian Banks are holders in due course of the negotiable instruments sued upon. CTI has put at issue the question of whether the Indian Banks are holders in due course of the purported trade acceptances but is denied a trial of this critical issue by the maintaining of the plea of collateral estoppel made by the Indian Banks.

CTI has never had a trial in any court on the merits of the issue of whether the Indian Banks are holders in due course, certainly not in the New York State Courts or in the Federal District Court below. Additionally, summary judgment was granted below though there was pending at the time an attempt by CTI to take the depositions of the principal officers of the three Banks and compel discovery of important documents in possession of the Banks. As the District Judge himself said in his written reasons for summary judgment, "[T]hese issues have not been resolved." Summary judgment should not be granted while discovery is still being attempted by the party against whom the motion is asserted where possession of the requested information would assist in defeating the motion. CTI (in its most recent brief) refers to this unusual procedure as follows: "All motions to compel discovery were superseded and bypassed when the court entered summary judgment on behalf of the Indian Banks. A hearing was never had on Motions to Compel Discovery."

The New York State summary judgment resulted from a suit brought by CTI against New Central for an accounting under a written contract pertaining

to the importation of jute. After it was filed the suit lay dormant. Then New Central took the initiative in the suit and on two days' notice by its counsel to CTI filed a motion for an order to compel CTI to arbitrate the issues and disputes there, and for a stay of the New York case pending proceedings in Georgia until arbitration be had between the parties with respect to these issues. New York has special statutory provisions to compel arbitration where a party is aggrieved by the failure of another to arbitrate, and for expedited trial thereof by the Court. See Section 7503(a), (b), C.P.L.R.[1] Several additional days' delay on the motion were granted. The motion was supported only by an affidavit of counsel for New Central. Thereafter, a reply affidavit of CTI's counsel was filed stating that New Central was not entitled to arbitration because it had breached the contract by having the Indian Banks as alter egos file the Georgia proceedings. There followed a reply affidavit of New Central's counsel (not said to be or based on personal knowledge) which argued that the only issue was whether arbitration should be granted under the contract. In the New York State case, the question whether the Indian Banks were holders in due course was not an issue and the Indian Banks were not parties to the suit. However,

New Central counsel's reply affidavit (not based on personal knowledge) in the New York case stated, " * * * the action in the State Courts of Georgia and Delaware were not instigated or instituted by Defendant herein, but by several banks which are holders in due course of certain drafts made by Plaintiff herein payable to the order of Defendant herein and accepted by Plaintiff and thereafter negotiated by Defendant herein to the said banks. No matter how hard Plaintiff may try to merge Defendant's identity with the banks, the fact is otherwise. The banks purchased the drafts from Defendant in the normal course of business and attempted to receive payment thereon from Plaintiff." No other evidence was before the New York Court. Summary judgment was eventually granted on the arbitration issue, solely supported by New Central counsel's affidavits. Such a summary judgment would be inappropriate in a Federal Court since it is based on counsel's affidavits, not made on personal knowledge, and therefore violates Rule 56(a), Fed.R.Civ.P. The New York State procedure (Rule 3212(b), C.P.L.R.) similarly provides that when a motion for summary judgment is supported by affidavit it "shall be by a person having knowledge of the facts * * *."[2]

1. The special provisions read as follows:
"(a) Application to compel arbitration; stay of action. A party aggrieved by the failure of another to arbitrate may apply for an order compelling arbitration. Where there is no substantial question whether a valid agreement was made or complied with, and the claim sought to be arbitrated is not barred by limitation under subdivision (b) of section 7502, the court shall direct the parties to arbitrate. Where any such question is raised, it shall be tried forthwith in said court. If an issue claimed to be arbitrable is involved in an action pending in a court having jurisdiction to hear a motion to compel arbitration, the application shall be made by motion in that action. If the application is granted, the order shall operate to stay a pending or subsequent action, or so much of it as is referable to arbitration.

"(b) Application to stay arbitration. Subject to the provisions of subdivision (c), a party who has not participated in the arbitration and who has not made or been served with an application to compel arbitration, may apply to stay arbitration on the ground that a valid agreement was not made or has not been complied with or that the claim sought to be, arbitrated is barred by limitation under subdivision (b) of section 7502."

2. Rule 3212(b), C.P.L.R., reads as follows:
"(b) Supporting proof; grounds; relief to either party. A motion for summary judgment shall be supported by affidavit, by a copy of the pleadings and by other available proof, such as depositions and written admissions. The affidavit shall be by a person having knowledge of the facts; it shall

This has been construed by the New York Courts, for example, in cases where an attorney makes the affidavit, to mean that the attorney must have personal knowledge of the facts or the motion is fatally defective, Wick v. Cornrich Beverages, Inc., 1966, 27 A.D.2d 595, 275 N.Y.S.2d 745, and worthless, French v. Colamaio, 1968, 56 Misc.2d 471, 288 N.Y.S.2d 761. New Central's attorney did not have (nor does he state that he has) personal knowledge of the conclusory statements in his affidavit relative to the Banks being holders in due course. Nonetheless, the Federal District Court below predicated its summary judgment on collateral estoppel of the New York State judgment which was not properly supported by affidavit.

Based on the unsupported statement in New Central counsel's affidavit, not on personal knowledge of affiant, Justice Sarafite of the New York Supreme Court, New York County, said in his opinion that the Banks were holders in due course of the drafts executed by CTI. It is obvious that the statement relative to the Banks being holders in due course was pure dictum, and was not even before the Court for decision. The New York Justice had nothing to rely upon in this regard to back up his statement.

When the New York case ultimately reached the New York Court of Appeals, in an opinion by Justice Burks, New Central's right to an arbitration order was affirmed and CTI's alter ego contention was rejected as lacking sufficient evidentiary support. The final decision made no reference, however, to the Sarafite dictum as to whether the Indian Banks were holders in due course.[3] The Federal District Court below was in nowise required to give effect—under the plea of collateral estoppel—to the Sarafite statement that the Banks were holders in due course. Nor should we be bound. The issue is still an open one— as open as the question of whether the Banks are in fact holders at all of the trade acceptances. The majority opinion has not stated that we are constrained to decide, on the principle of collateral estoppel, that the Banks are holders of the instruments. By the same token we should not be bound to a holding that the Banks are holders in due course and should remand that issue also for trial.

I do not believe it can be seriously contended that CTI has had a full and fair opportunity for a hearing on the issue of holder in due course. It has never had a hearing anywhere on this issue though it has consistently disputed the status of holder in due course of the Indian Banks. CTI was cut off without even being permitted discovery in the court below. We, therefore, have a classic case of the granting of a judgment against a litigant without due process of law.

It is said that a trend is developing toward the acceptance of the collateral estoppel doctrine. Professor Currie, an adherent thereof, points out, however, that "No legal principle, perhaps least of all the principle of collateral estoppel, should ever be applied to work injustice."

recite all the material facts; and it shall show that there is no defense to the cause of action or that the cause of action or defense has no merit. The motion shall be granted if, upon all the papers and proof submitted, the cause of action or defense shall be established sufficiently to warrant the court as a matter of law in directing judgment in favor of any party. The motion shall be denied if any party shall show facts sufficient to require a trial of any issue of fact other than an issue as to the amount or the extent of the damages. If it shall appear that any party other than the moving party is entitled to a summary judgment, the court may grant such judgment without the necessity of a cross-motion."

3. The opinion said that two Indian Banks had filed proceedings in Georgia and Delaware State Courts and that "In each case, the bank asserted its status as holder in due course of a draft received from New Central." Nothing more, however, on this subject.

Currie, Civil Procedure. The Tempest Brews, 53 Calif.L.Rev. 25, 37 (1965).

"The statement has frequently been made that a judgment has conclusive force only between persons who are parties to the action or in privity with them." 1B Moore's, Federal Practice ¶ 0.411 at 1251. Professor Moore, an advocate of the principle of mutuality, is in sharp disagreement with its critics. He states that "The doctrine of mutuality requires that, as a general proposition, one who invokes the conclusive effect of a judgment must have been either a party or his privy to the suit in which the judgment was rendered. Stated differently, the mutuality requirement prevents a litigant from invoking the conclusive effect of a judgment unless he would have been bound if the judgment had gone the other way. 'It is a principle of elementary law,' the Supreme Court has said, 'that the estoppel of a judgment must be mutual.'" (Citing by footnote Bigelow v. Old Dominion Copper Mining & Smelting Co., 225 U.S. 111, 127, 32 S.Ct. 641, 56 L.Ed. 1009 (1912).) 1B Moore's, Federal Practice ¶ 0.412 at 1801–02. Professor Moore continues, "Most state courts recognize and apply the doctrine of mutuality, subject to certain exceptions subsequently discussed. And the same is true of federal courts, when free to apply their own doctrine. A few courts, however, have renounced the doctrine of mutuality, in whole or in substantial part, and permit a litigant— normally a defendant—to invoke the conclusive effect of a judgment rendered in a suit to which he was neither party nor privy." Id. at 1803–05.

In the most recent case in which this Court has had occasion to discuss the principle of collateral estoppel, Rachal and Hunnicut v. Hill, 5 Cir., 1970, 435 F.2d 59, Judge Morgan writing for the Court quoted with approval the following excerpt from the leading federal case of the Third Circuit, Bruszewski v. United States, 1950, 181 F.2d 419, 421, cert. denied, 340 U.S. 865, 71 S.Ct. 87, 95 L. Ed. 632, as follows:

"* * * a party who has had one fair and full opportunity to prove a claim and has failed in that effort, should not be permitted to go to trial on the merits of that claim a second time. Both orderliness and reasonable time saving in judicial administration require that this be so *unless some overriding consideration of fairness to a litigant dictates a different result in the circumstances of a particular case.*" (Emphasis supplied.)

I submit that the present matter is such a case.

In *Rachal*, the Court declined to apply the doctrine of collateral estoppel as being inappropriate under the circumstances, the Court holding, "[I]t would be anomalous to hold that the appellants have lost their right to a trial by jury on the issue of whether they are liable to respond in damages for violations of the security laws because of a prior adverse determination by the district court of the same issue in an action in which their present adversary was not a party and which arose in a different context from the present action." Id. at 64 of 435 F.2d. Therefore, *Rachal* strongly supports my dissenting views.[4]

It is conceded in the majority opinion by citation of The Evergreens v. Nunan, 2 Cir., 1944, 141 F.2d 927, cert. denied,

---

4. The following from 1B Moore's Federal Practice ¶ 0.443 [5], at 3919, is especially pertinent:

"Even though an issue was raised and fully litigated in a prior action, and a finding on the issue was made by the court preliminarily to rendition of judgment, the issue is not concluded by the resulting judgment unless the finding made on the issue was, at least alternatively, necessary to the judgment rendered. Thus an incidental or collateral determination of an issue that was not material in the prior action does not foreclose reconsideration of that issue in later litigation in which the issue is material." (Citing numerous cases by footnotes in support of the text.)

323 U.S. 720, 65 S.Ct. 49, 89 L.Ed. 579, that we are free to go beyond the judgment roll to ascertain what facts have been conclusively established in the prior action. When we do so, we find that there was no actual litigation in New York of the issue of the Banks being holders in due course, that the Banks were not parties to the proceedings, that the context of the New York case was whether arbitration should be ordered as between CTI and New Central, that the statement of Justice Sarafite that the Banks were holders in due course of the trade acceptances were pure dictum and was supported solely by an affidavit of New Central's counsel (not on personal knowledge), and that the highest New York Court in finally deciding the case did not determine whether the Banks were holders in due course and did not pass on this issue.

All of this being true, it seems inescapable that we should reverse the District Court's ruling that the principle of collateral estoppel is applicable under the circumstances here, and in the remand of the case we should open for full litigation and trial on the merits the issue of whether the Banks are holders in due course of the instruments sued upon in this case.

I respectfully dissent.

ON PETITION FOR REHEARING
AND PETITION FOR RE-
HEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12), the Petition for Rehearing En Banc is denied.

AINSWORTH, Circuit Judge:

I dissent from failure to grant rehearing.