Burke, J.
New Central Jute Mills is an India corporation which manufactures jute backing cloth for carpets. On November 21, 1959 New Central entered into an agreement with plaintiff, City Trade & Industries (hereinafter referred to as CTI), whereby CTI agreed to act as defendant New Central’s exclusive distributor and selling agent in both the United States and Capada. CTI’s remuneration was restricted to a predetermined percentage of the purchase price of all orders forwarded, to New Central.
Since CTI’s compensation was dependent entirely upon sales, that corporation necessarily wished to secure some assurance from New Central that the offering price for its jute backing doth would be competitive. Conversely, since New Central was willing to retain CTI as its exclusive representative with the power to bind it in its contractual representations, it was essential to New Central that it retain some power with reference to the price at which its goods would be sold. Without such control, this Indian corporation feared it might well find itself committed to contractual agreements negotiated by CTI solely for the purpose of increasing the total salés and enhancing its compensation, to New Central’s obvious detriment.
*53 The competing interests of the parties resulted in the adoption of the following contractual arrangement:
"6) * * * CTI shall effect sales of new central’s manufactured goods to CTI’s customers in the territories covered by this agreement at prices mutually agreed upon from time to time between new central and CTI. Such prices shall be in line with those of similar goods manufactured in India by Ludlow Jute Co., Ltd., and distributed in the territory covered by this agreement. CTI shall regularly submit to new central copies of all their sales contracts.
“7) * * * new central allows CTI to use due and reasonable discretion to grant a maximum discount of 2% on prices as referred to in paragraph (6), but only in case goods cannot otherwise be adequately sold. * * * CTI also may request new central’s approval for sales at below their prices as referred to in paragraph (6) and above, should any important business be possible only at this reduced price.”
By agreement, the relationship was to continue until March 31, 1964, at which time the parties would evaluate their respective positions and determine whether the association should be extended, When that date arrived, New Central and CTI were unable to agree on terms for extending the initial arrangement. Accordingly, the distributorship came to an end. The present action was then commenced by plaintiff CTI, and the sole relief sought was an accounting for the duration of the contract. New Central moved to stay this accounting and demanded instead that plaintiff submit all disputes and issues to arbitration, as originally provided for in the contract. CTI opposed the demand for arbitration and asserted that the contract—on which the accounting was premised—was actually invalid and unenforceable as certain provisions effectively provided for “vertical price fixing” in violation of the Federal antitrust laws.
Special Term directed a trial on the issue of illegality. Justice Rosenberg, to whom the matter was referred, concluded that the contract was not a unilateral pricefixing agreement, but constituted instead an agreement whe.rein the specific terms provided that the goods be sold at a price which would be mutually acceptable. Justice Rosenberg’s determination was made following the submission of an agreed statement of facts, *54 presented by the parties to show the manner in which' they observed the provisions of the contract. The stipulation established the following course of conduct. From time to time, New Central sent CTI lists containing prices approved by New Central for sales by CTI to its American customers. However, few sales were made by CTI at these prices, as they were seldom realistic in view of prevailing market conditions. Consequently, CTI would ignore the recommended prices and would instead forward orders to New Central, listing the quantity of the desired goods as well as the contract price quoted to the purchaser by CTI. Invariably, New Central would confirm this price by delivering the requested goods. During the latter part of this exclusive distributorship, CTI adopted a standard contract which informed purchasers that CTI had executed the agreement “as agents for New Central Jute Mills Co. Ltd.,” and that the contract was “ subject to confirmation ”.
The stipulation effectively demonstrated that the parties failed to adhere to the elaborate price fixing arrangement embodied in their contract and, by their conduct, reduced the principal-to-principal relationship described in their distributorship agreement to a mere agency wherein the agent was given full authority to select a price which was then forwarded to the principal for ratification. It was Justice Rosenberg’s opinion, based upon the contract and these, stipulated facts, that the agreement between these parties was not violative of the antitrust laws and did not constitute a restraint on trade.
Following this determination, Special Term directed the parties to arbitrate their dispute and stayed the plaintiff from proceeding in another action then pending in the Federal court. The Appellate Division, First Department, modified this order by (Meting the provision which stayed the plaintiff from proceeding further in another action then pending in Federal court. Since we conclude that the agreement between the parties does not constitute vertical price fixing in violation of the antitrust laws, we affirm that portion of the Appellate Division determination requiring the plaintiff to submit its claim to arbitration. We are also of the opinion that the Appellate Division properly exercised its discretion when it deleted the provisions of Special Term’s order requiring plaintiff to stay its action then pending in a Federal court in Georgia.
*55 CTI advances three points on this appeal. The argument is made at the outset that the defendant is precluded from asserting its rights to arbitration because of its alleged involvement in prior litigations against the plaintiff in other jurisdictions through various “ alter egos.” Specific reference is made to prior proceedings conducted in the Georgia and Delaware State courts. Both actions were attachment proceedings, brought by two Indian banks against quantities of jute backing located in the respective jurisdictions. In each case, the bank asserted its status as holder in due course of a draft received by them from New Central. The status of “ alter ego ” is inferred by plaintiff from the participation of the defendant’s attorney as an adviser to these foreign banks in the attachment proceedings. Without additional evidence to support it, this claim must be dismissed as meritless. As Justice' Sabaeite observed, after setting forth the exact nature of these proceedings, “It strains credulity to conclude, as plaintiff urges, that these other parties are defendant’s ‘ alter egos acting at [its] instigation and command. ’ ”
The second contention advanced by CTI is that New Central waived its right to arbitration by waiting 18 months after the action for an accounting had been commenced before seeking to enforce its arbitration agreement. Concededly, in Matter of Zimmerman v. Cohen (236 N. Y. 15), this court held that a party had waived its right to arbitration where the alleged delay exceeded two years and the party proceeded during that time to treat the complaint in the ordinary manner. In the instant case, CTI had stipulated to several extensions of time for serving the answer to the complaint. While the request for arbitration was not made for 18 months, it was forthcoming within the stipulated period for filing an answer.'- Additionally, CTI admits it acquiesced in New Central’s failure to proceed aggressively because of a mutual desire to bring about an amicable disposition of the controversy. It is well settled that a demand for arbitration is timely where it is made prior to the filing of an answer. (See Matter of Haupt v. Rose, 265 N. Y. 108; see, also, Domke, Law and Practice of Commercial Arbitration, § 19.01.) Thus, while the request for arbitration was truly made after a considerable lapse of time, it was nevertheless timely because of the stipulation and the general acquiescence by CTI.
*56 The concluding argument presented by plaintiff is that the agreement is illegal under Federal antitrust laws and, hence, unenforceable. Were the premise valid, the conclusion would indeed be sound. However, there is nothing in this record that creates even a question of impropriety under the Federal decisions.
It is well settled that a claim of illegality such as that advanced by the plaintiff serves effectively to prevent the commencement of the arbitration proceeding until a trial has been held to determine the validity of the claim. (See Matter of Aimcee Wholesale Corp. [Tomar Prods.], 21 N Y 2d 621; Durst v. Abrash, 17 N Y 2d 445, affg. 22 A D 2d 39.) Nor is there any doubt -that State courts have jurisdiction to consider the merits of a claim which alleges that the agreement before the court violates the Sherman Antitrust Act where, as here, the claim is presented for the sole purpose of preventing the commencement of binding arbitration. Indeed, in General Aniline & Film Corp. v. Bayer Co. (305 N. Y. 479, 484-485), we stated that a party to an action brought in the courts of this State ‘ ‘ may, of course, * * * defend upon the ground that the contract sued upon runs afoul of the [Federal] antitrust laws and is, therefore, illegal.” (See, also, Metropolitan Opera Co. v. Hammer stein, 221 N. Y. 507.) The wisdom of these decisions is apparent when one realizes that a contrary result—prohibiting a State court from examining a claim of illegality advanced under the Sherman Act—would permit a party to a contract such as plaintiff CTI to circumvent many of the intended benefits of an arbitration agreement merely by alleging that the agreement, in some ambiguous way, constituted an antitrust violation.
In the instant case, the claim was advanced that the agreement between the parties provided for vertical price fixing. “ Under the Sherman Act, a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate, or foreign commerce is illegal per se.” (United States v. Socony-Vacuum Oil Co., 316 U. S. 150, 223; see, also, United States, v. Masonite Corp., 316 U. S. 265.) These decisions have consistently limited their application to situations where the prices were controlled by parties who were combined in a principal-to-priricipal rela *57 tionship. “ [T]here is nothing as a matter of principle, or in the authorities, which requires us to hold that genuine contracts of agency like those before us, however comprehensive as a mass or whole in their effect, are violations of the Anti-Trust Act.” (United States v. General Elec. Co., 272 U. S. 476, 488.)
The holding in General Electric has recently been challenged in Simpson v. Union Oil Co. (377 U. S. 13). While that case dealt specifically with a consignment agreement, Justice Douglas wrote that "There is an actionable wrong whenever the restraint of trade or monopolistic practice has an impact on the market; and it matters not that the complainant may be only one merchant.” (377 U. S., at p. 16.) The dissenters viewed the court’s decision as overruling General Electric. (377 U. S., at p. 29.) Their argument was not acknowledged by the majority of the court, and we may, therefore, assume that the Supreme Court did not overrule its decision in General Electric, so that general agency agreements continue to be immune from the Federal antitrust statutes.
In the instant case, it is not necessary that we base our determination on the arguable ground that this was a price fixing arrangement between a principal and his agent. In truth, as the stipulated facts clearly indicate, there was no fulfillment of the contested contractual arrangement. Instead, CTI would independently negotiate a contract price with a prospective customer and inform New Central of that price for the first time when it forwarded the individual orders. Construing the activities of the parties in the light most favorable to plaintiff, it is apparent that the conduct described in the stipulated facts was not violative of the antitrust laws. Since the parties did not pursue the price fixing agreement, it is irrelevant that their relationship was one of principal and agent.
We note parenthetically that plaintiff raised this claim of illegality after attempting to obtain an accounting under this same contract. While such inconsistency on CTI’s part does not render the claim nonreviewable (cf. Domke, op. cit., supra, § 39.04) it does illustrate the specious nature of the claim and its true purpose in. the present litigation. For these reasons, we conclude that the order of the Appellate Division, requiring plaintiff to submit to arbitration, was proper.
*58 The defendant requests that the Appellate Division’s order be modified and that we restore the provision in the order of Special Term staying the plaintiff from proceeding against the defendant in the action already commenced in the Southern District of Georgia. The affidavits of the parties furnish these facts concerning the Georgia action. It is an interpleader action, commenced by James Talcott, Inc., a New York commercial factoring organization that had acted as a factor for CTI in connection with its sales of New Central goods. The exact nature of the action is not before us, but we are told that CTI made a motion that New Central be joined as a third-party defendant. The order was granted and it is this interpleader action that defendant wants stayed.
The most recent decision of this court, which deals with the power of the Supreme Court to grant a stay of an. action in a foreign court, is Matter of Wolff Co. (Tulkoff) (9 N Y 2d 356). In writing for a unanimous court, Chief Judge Fuld stated that “ the courts of this State possess the power to stay proceedings wherever they may be pending.” (9 N Y 2d, at p. 361.) The mere existence of this power, however, is not dispositive, for the question presently before us is whether the Appellate Division, in modifying that order "on the law, on the facts and in the exercise of discretion ” abused that discretion.
The answer, quite clearly, is that the modification did not constitute such an abuse. The singular fact that the nature and purpose of the Georgia action was not sufficiently clear constitutes a proper basis for the exercise of discretion. Justice Steuer, in a recent dissenting opinion, made this point when he wrote: “ [A] ssuming that the power [to restrain plaintiff from proceeding in the Georgia action] goes to the extent claimed, there is a vast difference between a power and its proper exercise. It has always been the rule that proceedings begun in another State should not be interfered with unless there is some necessity clearly shown * * * Generally the court which has first taken jurisdiction is the one in which the matter should be determined and it is a violation of the rules of comity to interfere.” (Hamilton & Co. v. American Home Assur. Co., 21 A D 2d 500, 506, 507.) Under the circumstances of this case, and in view of the deficiencies in the record with regard to this Georgia action, it cannot be said that the Appellate Division *59 abused its discretion by deleting that provision which stayed the Georgia action.
For all these reasons, the order of the Appellate Division should be affirmed.
Chief Judge Ftjld and Judges Scileppi, Bergan, Breitel and Jasen concur.
Order affirmed.