[841 NYS2d 82]

L-3 COMMUNICATIONS CORPORATION, Appellant, v SAFENET, INC., Respondent.

First Department, August 30, 2007

**APPEARANCES OF COUNSEL**

*Blank Rome LLP*, New York City (*Kenneth L. Bressler* and *Jeremy L. Reiss* of counsel), for appellant.

*Venable, LLP*, Baltimore, Md. (*John A. McCauley*, of the Maryland bar, admitted pro hac vice, and *Kambon R. Williams* of counsel), and *Venable LLP*, New York City (*Lawrence H. Cooke II* and *Liam C. Ewing, Jr.*, of counsel), for respondent.

**OPINION OF THE COURT**

GONZALEZ, J.

This appeal requires us to determine which of two competing forums, New York or Maryland, is the appropriate forum for litigation of this dispute over an exclusive licensing agreement. Specifically, we are asked to decide whether the forum selection clause in the parties' agreement is mandatory or permissive, whether the Maryland action should be given priority based on the first-in-time rule, and whether defendant SafeNet's wholly-owned subsidiary is a necessary party to this action (*see* CPLR 3211 [a] [4], [10]).

It is unnecessary for us to address the parties' conflicting interpretations of the forum selection clause, since even if we found it to be permissive only, we would still hold that this action should not be dismissed in favor of the earlier-filed Maryland action, which itself has subsequently been dismissed. We further conclude that New York is an appropriate forum for this litigation and that justice requires that the action proceed, notwithstanding plaintiff's failure to join a necessary party.

The subject of this litigation is a March 2001 Joint Development and Licensing Agreement (Agreement) executed by plaintiff L-3 Communications Corporation and nonparty Cylink, which was acquired by SafeNet in February 2003, and fully merged into it in December 2005. Pursuant to the Agreement, Cylink granted L-3 an exclusive license to use Cylink's encryption technology, known as "Nethawk," to develop a Type 1 Virtual Private Network (VPN) encryptor. A Type 1 VPN encryptor, also known as a "network" encryptor, is a device that allows users to send and receive encrypted communications over the Internet. L-3 paid Cylink a $100,000 licensing fee for use of the Nethawk technology and agreed to make royalty payments based on a percentage of its revenue from sales of Type 1 VPN products. Subsequently, in accordance with the Agreement, L-3 used the Nethawk technology to develop a Type 1 VPN product named "RedEagle."

The Agreement included two key provisions that are relevant to this appeal. The first is a noncompetition clause, in which Cylink expressly warranted that it "shall not develop, market

or sell, *directly or indirectly,* a product that competes with the product (or derivatives thereof in the same product family) in the field of use" (emphasis added).

The second provision is a combined choice of law, consent to jurisdiction, and forum selection clause. It reads as follows:

> "**Governing Law**. This Agreement shall be governed in all respects, including as to validity, interpretation and effect, by the internal laws of the State of New York without giving effect to the conflict or choice of laws rules thereof. The Parties hereby irrevocably submit to *the non-exclusive jurisdiction* of the courts of the State of New York and the federal courts of the United States of America located in the Southern District of New York solely in respect of the interpretation and enforcement of the provisions of this Agreement and of the documents referred to in this Agreement, and hereby waive and agree not to assert as a defense in any action, suit or proceeding for the interpretation or enforcement hereof or of any such document, that it is not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable in said courts or that the venue thereof may not be appropriate or that this Agreement or any such documents may not be enforced in or by said courts. *All claims with respect to such action or proceeding shall be heard and determined in such a New York state or federal court.* The parties hereby consent to and grant any such court jurisdiction over the person of the Parties and over the subject matter of any such dispute" (emphasis added).

In June 2002, the United States Department of Defense (DOD) contracted with nonparty Mykotronx, then a subsidiary of Rainbow Technologies, to develop a Type 1 link encryptor to be marketed as "KIV-7M." Link encryptors differ from VPN encryptors in that they secure "point to point" communications, as opposed to network communications. KIV-7M was eventually released to the Type 1 market in 2005.

In December 2003, the Agreement between L-3 and Cylink was amended, whereby L-3 made a one-time payment of $3.4 million to SafeNet in exchange for a waiver of future royalty payments. In addition, L-3 alleges that during negotiations over the amendment SafeNet orally represented that neither it, nor

its wholly owned subsidiaries, would compete with L-3 in the relevant market.

In 2004, SafeNet acquired Rainbow Technologies and subsequently merged it into SafeNet in 2005. As a result of this acquisition, Mykotronx became a wholly-owned subsidiary of SafeNet. Also in 2004, Mykotronx and DOD amended their agreement to authorize Mykotronx to develop a network adapter card, known as a HAIPE blade, which would give the KIV-7M the ability to encrypt network communications in addition to its link (point to point) encryption capability. In 2005, DOD contracted to purchase up to $150 million worth of KIV-7M products and accessories from Mykotronx.

In April 2006, L-3 accused SafeNet of violating the Agreement's exclusive license and noncompetition clauses by permitting its wholly-owned subsidiary Mykotronx to develop a product that both utilizes Nethawk technology and competes with L-3's Type 1 VPN encryptor RedEagle. L-3 warned SafeNet that litigation would ensue unless SafeNet stopped developing these products in violation of the Agreement. Settlement discussions took place between the parties, during which L-3 produced a draft complaint that it would file in the event the dispute could not be resolved. SafeNet contends that during these same negotiations, it offered to allow an independent third party acceptable to L-3 to inspect the KIV-7M and HAIPE blade to confirm the absence of Nethawk technology, but L-3 refused the offer. SafeNet also requested a written explanation for L-3's proposed legal claims, which L-3 provided, and SafeNet, according to L-3, promised to provide a written response.

Instead, on May 7, 2006, SafeNet and Mykotronx filed a preemptive declaratory judgment action against L-3 in Harford County, Maryland. The complaint sought a declaration that the KIV-7M and HAIPE blade neither used Nethawk technology nor violated the Agreement, that the Agreement did not prevent Mykotronx from developing or selling these products, and that SafeNet did not orally agree to be bound by the noncompetition provision of the Agreement.

On May 11, 2006, four days later, L-3 filed the instant New York action against SafeNet seeking injunctive relief and damages. Mykotronx, which apparently has no contacts with New York, was not named a defendant in the action. The complaint alleged causes of action for breach of contract relating to the exclusive license and noncompetition provisions, fraudulent inducement with respect to the amendment to the Agreement, and breach of the Agreement's forum selection clause.

On June 1, 2006, SafeNet moved to dismiss or stay the New York action, arguing that the Maryland action was filed first in time, that principles of comity and forum non conveniens dictate that these claims be litigated in Maryland, and that L-3 failed to join Mykotronx, a necessary party to this action. On the latter point, Mykotronx's president submitted an affidavit demonstrating that the corporation is fully capitalized and maintains a separate corporate structure from SafeNet, its corporate parent. In opposition, L-3 argued that the Agreement's forum selection clause mandated that this dispute be litigated in a New York state or federal district court, and that Mykotronx was not a necessary party under CPLR 1001 (a).

In the order appealed from, the motion court declined to interpret the forum selection clause. Instead, the court deferred that issue to the Maryland court, since that action was filed first in time, and then dismissed the action due to L-3's failure to join Mykotronx as a necessary party. The court rejected L-3's argument that SafeNet, rather than Mykotronx, was the owner of the disputed products, and further found that L-3 had failed to show that SafeNet completely dominated and controlled Mykotronx so as to render its presence unnecessary.

On appeal, L-3 argues that the forum selection clause in the Agreement is mandatory, not permissive, and that the motion court erred in declining to consider it before applying the first-in-time rule. L-3 further argues that the first-in-time rule is inapplicable here where the Maryland action was clearly a preemptive one aimed at securing the most favorable forum. Third, L-3 argues that Mykotronx is not a necessary party to this action, but that even if it is, a stay rather dismissal is appropriate under the unique circumstances of this case. We reverse.

Preliminarily, new facts have come to light after this appeal was submitted for decision. In letter submissions, the parties have advised this Court that on April 3, 2007, the Circuit Court of Harford County, Maryland, issued a decision granting L-3's motion to dismiss the Maryland action on the ground of improper venue. The Maryland court interpreted the forum selection clause in the Agreement as mandating that any litigation arising out of it be commenced in either New York state or federal district court. Specifically, the court found that the term "non-exclusive" did not negate the mandatory language used in connection with the more specific forum selection clause. In addition, the court ruled that although Mykotronx was a separate

corporate entity from SafeNet, and was not a party to the Agreement's forum selection clause, its interests were sufficiently similar to those of its corporate parent, SafeNet, that it should be required to litigate in New York as well.

We decline to rule on the parties' conflicting interpretations of the forum selection clause, because irrespective of whether the clause requires or merely permits litigation in New York, we conclude that under either scenario SafeNet's motion to dismiss based on another action pending or the failure to join a necessary party should have been denied (CPLR 3211 [a] [4], [10]). Indeed, even if the clause were judicially determined to be mandatory, this New York action would still be subject to dismissal for failure to join Mykotronx as a necessary party. Accordingly, since the permissive or mandatory nature of the forum selection clause is not determinative of the outcome of this appeal, we do not consider it and instead turn to the parties' arguments pursuant to CPLR 3211 (a) (4) and (10).

We conclude that the motion court's analysis of SafeNet's motion to dismiss on the ground of another action pending (CPLR 3211 [a] [4]) was flawed. CPLR 3211 (a) (4) permits a party to move for dismissal of a complaint where "there is another action pending between the same parties for the same cause of action in a court of any state or the United States." As indicated, SafeNet's motion was premised on the existence of the Maryland action, and it argued that such action should take precedence over this one because it was filed "first-in-time."

New York courts generally follow the first-in-time rule, which instructs that "the court which has first taken jurisdiction is the one in which the matter should be determined and it is a violation of the rules of comity to interfere" (*City Trade & Indus., Ltd. v New Cent. Jute Mills Co.*, 25 NY2d 49, 58 [1969] [internal quotations marks and citation omitted]). However, it is also clear that determining the priority of pending actions by dates of filing is a general rule that should not be applied in a "mechanical" way, and that special circumstances may warrant deviation from this rule where "the action sought to be restrained is vexatious, oppressive or instituted to obtain some unjust or inequitable advantage" (*White Light Prods. v On The Scene Prods.*, 231 AD2d 90, 97, 96 [1997] [internal quotations marks and citation omitted]; *see also Certain Underwriters at Lloyd's, London v Hartford Acc. & Indem. Co.*, 16 AD3d 167, 168 [2005]).

We find that dismissal pursuant to CPLR 3211 (a) (4) was unwarranted for several reasons. First, and most importantly,

there is no longer another action pending in Maryland. Although the dismissal of the Maryland action obviously postdated the motion court's ruling in this case, we are required to take judicial notice of the common law of our sister states (CPLR 4511 [a]), and we do so in this case with respect to the decision of the Circuit Court, Harford County. Although SafeNet has indicated an intent to appeal the Maryland dismissal, at present it is undisputed that there is no longer "another action pending" in Maryland (CPLR 3211 [a] [4]), and plaintiff finds itself without any forum in which to litigate its claim. Accordingly, because the premise of SafeNet's motion to dismiss pursuant to CPLR 3211 (a) (4)—the existence of a pending action in Maryland regarding the same subject matter—has now been eliminated, this factor weighs heavily against dismissal here in order to preserve plaintiff's claims.

Second, even if the Maryland action had not been dismissed, courts have often deviated from the first-in-time rule where one party files the first action preemptively, after learning of the opposing party's intent to commence litigation (*White Light Prods.*, 231 AD2d at 100 ["(d)efendants should not be rewarded for their precipitous filing, approximately a week after learning of plaintiffs' intention to bring an action"]; *see also Certain Underwriters at Lloyd's, London*, 16 AD3d at 168; *Matter of Topps Co. Inc. Shareholder Litig.*, 2007 NY Slip Op 31582[U]). Federal and state court decisions in New York have consistently rejected the application of the first-in-time rule in these circumstances on the ground that such a race to the courthouse would create disincentives to responsible litigation, by discouraging settlements due to fear of a preemptive strike and by providing a tactical advantage to defendants seeking a more favorable forum for litigation (*White Light Prods.* at 99; *see also Elbex Video, Ltd. v Tecton, Ltd.*, 2000 WL 1708189, *2, 2000 US Dist LEXIS 16531, *5 [SD NY, Nov. 15, 2000] [circumstances justifying exception to first-filed rule include where first suit constitutes an improper anticipatory filing or was motivated solely by forum shopping]).

Here, L-3 has convincingly shown that SafeNet commenced the Maryland declaratory action preemptively, in order to gain a tactical advantage. It is undisputed that L-3 had threatened litigation over the alleged breaches of the Agreement and that it had presented a draft complaint to SafeNet during the course of settlement discussions. Thus, SafeNet was clearly aware that L-3 was considering legal action to enforce its rights at the time

the Maryland action was commenced. Further, the format of that suit, a declaratory action, strongly suggests that it was responsive to L-3's threat of litigation (*White Light Prods.*, 231 AD2d at 98 [noting that tactic of filing declaratory lawsuit in apparent anticipation of lawsuit in another jurisdiction has been rejected]). In our view, these facts weigh heavily against application of the first-in-time rule, which otherwise would reward a party for winning the race to the courthouse (*Elbex*, 2000 WL 1708189 at *3, 2000 US Dist LEXIS 16531 at *8 [facts show that defendant in preemptive action is the "true plaintiff" in the dispute, and such action was filed to deprive plaintiff of its choice of forum]).

Third, the New York action was commenced a mere four days after the Maryland action and both actions were in their earliest stages at the time the instant motion to dismiss was made. New York courts have consistently held that even though the first-in-time rule is a factor to be considered in choosing the appropriate forum for litigation, " 'it is not controlling, especially when commencement of the competing action[s] has been reasonably close in time' " (*White Light Prods.*, 231 AD2d at 99, quoting *Flintkote Co. v American Mut. Liab. Ins. Co.*, 103 AD2d 501, 505 [1984], *affd* 67 NY2d 857 [1986]; *see also San Ysidro Corp. v Robinow*, 1 AD3d 185, 186 [2003] [technical priority in the commencement of actions is not necessarily dispositive, especially where both actions are at earliest stages of litigation]; *Hertz Corp. v Luken*, 126 AD2d 446, 450 [1987] [fact that Florida complaint filed few days earlier than New York complaint was "not particularly significant"]).

Fourth, New York does have a significant nexus to this dispute which justifies placing venue in New York (*White Light Prods.*, 231 AD2d at 99). L-3's principal place of business is in New York City, and it presumably negotiated and performed many aspects of the Agreement from that location. Although SafeNet's primary office is in Maryland, L-3 alleges in its complaint that it is authorized to do business in New York, and does in fact conduct such business in this state. In addition, the Agreement itself specifically includes the parties' express consent to the jurisdiction of the New York courts, and requires that New York law will apply to any action or proceeding regarding the interpretation or enforcement of the Agreement (*see* General Obligations Law § 5-1402 [1]; *Banco do Commercio e Industria de Sao Paolo v Esusa Engenharia e Construcoes*, 173 AD2d 340, 341 [1991] [noting that section 5-1402 expresses legislative policy

that New York courts willingly exercise jurisdiction in cases where parties submit to jurisdiction and agree to be governed by New York law]). These factors provide ample support for L-3's assertion that New York is an appropriate forum for this litigation.

Accordingly, we find that even without considering the dismissal of the Maryland action, the motion court improvidently exercised its discretion in dismissing this action pursuant to CPLR 3211 (a) (4).

We next turn to L-3's next argument that the motion court erred in dismissing the action for failure to join Mykotronx as a necessary party (CPLR 3211 [a] [10]). L-3 claims that Mykotronx is not a necessary party to this action because it was not a party to the Agreement that was allegedly violated; only SafeNet is alleged to have violated such Agreement. L-3 also makes the puzzling assertion that it is not seeking any relief directly from Mykotronx.

■ Under CPLR 1001 (a), a person or entity ought be joined as a party to an action if such person or entity "might be inequitably affected by a judgment" in the action (*Matter of Red Hook/Gowanus Chamber of Commerce v New York City Bd. of Stds. & Appeals*, 5 NY3d 452, 457 [2005]). In this case, no reasonable argument can be made that Mykotronx would not be "inequitably affected" by a judgment in this New York action. L-3's complaint, while identifying SafeNet as the primary party in breach, also seeks to enjoin Mykotronx's development and sale of the KIV-7M and HAIPE blade and to disgorge its profits from those sales. Contrary to L-3's argument, both of those products are owned by Mykotronx, not SafeNet, and only Mykotronx is a party to the contract with DOD for their production. If L-3's request for an injunction and damages is successful, obviously Mykotronx would be prohibited from performing its contract with DOD and suffer a significant financial loss. Thus, under CPLR 1001 (a), Mykotronx is unquestionably a necessary party (*Red Hook/Gowanus* at 457).

Nevertheless, a finding that a person or entity is a necessary party under CPLR 1001 (a) does not mandate dismissal of the action (CPLR 1001 [b]; *Matter of 27th St. Block Assn. v Dormitory Auth. of State of N.Y.*, 302 AD2d 155, 161 [2002]). Instead, under CPLR 1001 (b), if jurisdiction cannot be obtained over the nonjoined party, the court, where justice requires, may allow the action to proceed in such nonparty's absence. In determining whether to allow the action to proceed, CPLR 1001

(b) requires a court to consider five factors: (1) whether plaintiff has another remedy if the action is dismissed for nonjoinder; (2) the prejudice which may accrue from nonjoinder to the defendant or to the nonjoined party; (3) whether and by whom prejudice might have been avoided or may in the future be avoided; (4) the feasibility of a protective provision; and (5) whether an effective judgment may be rendered in the absence of the nonjoined person.

The Court of Appeals has cautioned that each of the five factors, where applicable, must be considered (*Red Hook/Gowanus*, 5 NY3d at 459), and that the motion court's discretionary determination should be guided by the principle that dismissal for failure to join a necessary party should eventuate only as a "last resort" (*Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801, 821 [2003], *cert denied* 540 US 1017 [2003]; *see also Red Hook/Gowanus*, 5 NY3d at 459).

Applying the above-mentioned five factors to the instant case, we conclude that the action should be permitted to proceed in Mykotronx's absence. First, the dismissal of the Maryland action has created a substantial risk that plaintiff will be left without a remedy if this action is dismissed for nonjoinder. If SafeNet's anticipated appeal of that decision is unsuccessful, and this appeal results in an affirmance, then there will be no available forum in which L-3 can challenge the alleged breaches of the Agreement. Even if the Maryland action is reinstated on appeal, the record discloses that SafeNet has raised a statute of limitations defense regarding L-3's counterclaims in that action, which were not filed until after this action was dismissed by the motion court. Given the shortened one-year limitations period in the parties' Agreement, it is unclear whether plaintiff's counterclaims are timely. Because dismissal should be a last resort where plaintiff will be deprived of any remedy (*Saratoga County Chamber of Commerce v Pataki*, 100 NY2d at 820-821), this factor weighs heavily in favor of permitting the action to proceed.

The second factor requires an evaluation of the potential prejudice to SafeNet or Mykotronx if the action proceeds in Mykotronx's absence. With respect to SafeNet, we discern no prejudice at all. Although SafeNet's principal place of business is in Maryland, it expressly consented to the jurisdiction and forum of New York's courts in the Agreement, and therefore cannot be heard to complain about having to litigate in this forum. Further, while some of its primary witnesses are appar-

ently located either in Maryland, or California, where Mykotronx is located, any anticipated travel to New York rather than Maryland cannot be considered a major inconvenience.

Mykotronx, of course, stands on distinctly different footing. It may be fairly assumed that Mykotronx will be prejudiced in some way by having the legal issue of whether its production of the KIV-7M products violated the terms of the exclusive license agreement between L-3 and SafeNet litigated in its absence. More significantly, to the extent L-3 is seeking to enjoin Mykotronx from fulfilling its $150 million contract with DOD, it would clearly be prejudiced if it were not able to defend this claim for injunctive relief on its own behalf.

Although the risk of prejudice to Mykotronx is a matter of serious concern, we conclude that any such potential prejudice is clearly outweighed by the fact that SafeNet will be able to adequately protect the interests of Mykotronx in its absence. It is undisputed that Mykotronx is a wholly-owned subsidiary of SafeNet, a named defendant in this action. It is also true that both SafeNet and Mykotronx share a common interest in the successful completion of the $150 million contract with DOD for the sale of KIV-7M products and accessories. Obviously, SafeNet would, at a minimum, indirectly profit from any profits earned by its wholly-owned subsidiary. Indeed, the record shows that SafeNet itself has publicly represented in a news release that it (as opposed to Mykotronx) will benefit from the contract with DOD ("U.S. Department of Defense [DoD] awarded SafeNet a $150 million Indefinite Delivery Indefinite Quantity [IDIQ] contract for its new KIV-7M Link encryptor, representing the largest contract in SafeNet's history").

Accordingly, we find that because SafeNet and Mykotronx share the exact same goal of defeating L-3's legal claims that the development and sale of the KIV-7M products violates the licensing agreement, there is every reason to believe that SafeNet will adequately represent Mykotronx's interest in this New York litigation, thereby mitigating any prejudice resulting from nonjoinder (see *Extra Equipamentos E Exportacao Ltda. v Case Corp.*, 361 F3d 359, 364 [7th Cir 2004] ["we have great difficulty seeing how a 100 percent subsidiary could *ever* be an indispensable party"]; *Dainippon Screen Mfg. Co., Ltd. v CFMT, Inc.*, 142 F3d 1266, 1272-1273 [Fed Cir 1998] [patent-holding subsidiary was not indispensable party where its interests were adequately protected by its parent corporation, who shared common goal of upholding patent]).

We further find that any prejudice is substantially mitigated by the third factor, namely, a party's own ability to avoid any prejudice. Courts have routinely recognized that the ability of a nonjoined party to intervene in an action to avoid prejudice is a compelling factor in determining whether to dismiss a case for failure to join a necessary party (*Saratoga County Chamber of Commerce v Pataki*, 100 NY2d at 820-821; *Matter of 27th St. Block Assn. v Dormitory Auth. of State of N.Y.*, 302 AD2d at 163; *Dainippon Screen Mfg. Co., Ltd. v CFMT, Inc.*, 142 F3d at 1272). Here, Mykotronx clearly would have been permitted to intervene under CPLR 1012 or 1013, given its central role in producing the specific products that allegedly violate the licensing and noncompetition agreements. However, Mykotronx and its corporate parent elected not to have Mykotronx intervene and instead filed their preemptive action in Maryland. This deliberate choice of litigation strategy further mitigates any prejudice that exists under the second factor. By contrast, we note that L-3 could not have avoided the prejudice resulting from Mykotronx's nonjoinder, since jurisdiction cannot be obtained and Mykotronx has failed to voluntarily appear.

The fourth factor is the feasibility of a protective provision, which might be applicable to this case. L-3's request for injunctive relief complicates the analysis, because any such relief would necessarily bar Mykotronx from performing its contract with DOD, and therefore implicate Mykotronx's right to be heard as a necessary party. In contrast, if monetary damages from SafeNet were the sole relief requested, there would appear to be little need for Mykotronx as a party in this litigation, notwithstanding its technical ownership of the competing products. In order to avoid some of these difficulties, the court on remand might consider granting Mykotronx leave to intervene, or invite a reconsideration by L-3 of its request for injunctive relief. We do not endorse any specific proposal, but state our belief that SafeNet should bear any burden of seeking a protective provision, since it was clearly aware of the potential conflicts between the RedEagle and KIV-7M products once Mykotronx began developing the HAIPE blade.

The fifth factor, whether an effective judgment can be rendered in the absence of the nonjoined person, also weighs in favor of permitting this litigation to proceed. As noted, L-3's complaint seeks two primary forms of relief: (1) injunctive relief against SafeNet and its corporate entities from selling or marketing any products that violate the exclusivity or noncompetition provisions of the Agreement, and (2) damages caused

by the breaches of the Agreement, including disgorgement of SafeNet's profits resulting from those breaches. We reiterate that Mykotronx's absence would not be an impediment to a money judgment against SafeNet for breach of the Agreement, which clearly prohibits SafeNet from "directly or indirectly" competing with the L-3 products that are subject to the license agreement. Assuming a violation of the underlying agreement is established, such language would appear to justify holding SafeNet liable for Mykotronx's actions and prevent SafeNet from claiming that Mykotronx, the nonjoined entity, was the actual party in breach.

The injunctive relief presents a different issue. Whether an injunction granted in Mykotronx's absence would have any effect on it is unclear. However, even if that portion of the judgment were unenforceable, that would not take away from any damage award that L-3 might recover from SafeNet. Moreover, since SafeNet is the corporate owner of Mykotronx, it certainly has the power and authority to compel Mykotronx to either comply with an injunction or, alternatively, enter into a new agreement with L-3 that may compensate it for the losses caused by the competing products. In any event, the bottom line is that assuming a breach of the Agreement is established, a point on which we offer no opinion, a judgment against SafeNet for damages resulting from the breach will constitute an effective judgment within the meaning of CPLR 1001 (b).

Accordingly, the order of the Supreme Court, New York County (Richard B. Lowe, III, J.), entered September 21, 2006, which granted defendant's motion to dismiss the complaint for failure to join a necessary party, should be reversed, on the law, without costs, the motion denied, and the matter remanded for further proceedings consistent herewith.

Motion seeking leave to dismiss appeal denied.

MAZZARELLI, J.P., WILLIAMS, CATTERSON and KAVANAGH, JJ., concur.

Order, Supreme Court, New York County, entered September 21, 2006, reversed, on the law, without costs, defendant's motion to dismiss the complaint for failure to join a necessary party denied, and the matter remanded for further proceedings consistent with the opinion herein. Motion seeking leave to dismiss appeal denied.